### In re FLOORING AMERICA, INC., Debtor.

**Morton P. Levine, as Chapter 11 Trustee for the Estate of Flooring America, Inc., Plaintiff,**

v.

**Custom Carpet Shop, Inc., Defendant.**

Bankruptcy No. 00–68370.
Adversary No. 02–9211.

United States Bankruptcy Court,
N.D. Georgia,
Atlanta Division.

May 20, 2003.

See also 302 B.R. 389, 2003 WL 22885400.

Paul G. Durdaller, Barbara Ellis–Monro, Smith, Gambrell & Russell, Atlanta, GA, for Plaintiff.

David W. Adams, Ellis, Painter, Ratteree, & Bart, Savannah, GA, for Defendant.

Morton P. Levine, Levine & Block, Atlanta, GA, Chapter 11 Trustee.

### *ORDER*

JOYCE BIHARY, Bankruptcy Judge.

This adversary proceeding is before the Court on plaintiff's Motion for Summary Judgment. Plaintiff, the Chapter 11 Trustee, seeks a summary judgment on his claim to recover a $50,000.00 transfer made by debtor to defendant within 90 days of filing bankruptcy as either: (1) a preferential transfer pursuant to 11 U.S.C. § 547(b), or (2) a fraudulent conveyance pursuant to 11 U.S.C. § 548(a)(1)(B). This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(F) and (H). After carefully considering the parties' briefs and the affidavits submitted, the Court concludes that there are no issues of material fact with regard to plaintiff's preference claim

and that plaintiff is entitled to summary judgment.

The material facts are undisputed. Debtor, Flooring America, Inc. ("Flooring America"), then operating as The Maxim Group, Inc., and defendant, Custom Carpet Shop, Inc. ("Custom Carpet") entered into a Franchise Agreement in February of 1991. Under the terms of the Franchise Agreement, Flooring America authorized Custom Carpet to operate several retail stores within an exclusive area under the Carpetmax franchise name. Custom Carpet paid Flooring a non-refundable $25,500.00 franchise fee in connection with the Franchise Agreement.

While the parties were operating under the Franchise Agreement's terms, Flooring America entered into Vender Rebate Programs with several of its product suppliers. Pursuant to the Vendor Rebate Programs, Flooring America would collect rebates or commissions from certain suppliers based on the amount of product sold by franchisees such as Custom Carpet. The rebates that Flooring America received pursuant to the Vendor Rebate Programs were initially placed into the Maxim Group, Inc. Rebate Account and subsequently transferred as needed to the Maxim Group, Inc. Master Account ("Consolidation Account") where the rebates were commingled with funds from over 281 stores' sales receipts and other funds. Flooring America would transfer funds from the Consolidation Account to the Maxim Group, Inc. Operating Account ("Operating Account"). Flooring America made rebate payments to franchisees such as Custom Carpet and funded operating expenses out of the Operating Account. Flooring America made rebate payments to Custom Carpet which satisfactorily compensated Custom Carpet for sales made through November of 1999.

On February 9, 1999, Custom Carpet informed Flooring America that it believed that Flooring America had violated the Franchise Agreement by infringing on Custom Carpet's exclusive territory. On February 12, 2000, Custom Carpet demanded payment from Flooring America for, *inter alia,* past due rebate payments. On March 11, 2000, Custom Carpet sent another letter to Flooring America requesting payment of $75,000.00 to satisfy Custom Carpet's claims for alleged rebate payments owed and for alleged breach of contract claims. On March 23, 2000, Flooring America and Custom Carpet entered into a Termination and Release Agreement which terminated the parties franchisor/franchisee relationship and whereby Flooring America agreed to pay Custom Carpet $50,000.00 which comprised a "complete: (i) refund of the amount [Custom Carpet] paid as its initial franchise fee; and (ii) payment of any and all rebate sums to which [Custom Carpet] may be entitled." The Termination Agreement also contained a complete release of any claims that Custom Carpet may have had against Flooring America "in any way related to: (i) the [Franchise] Agreement; (ii) the franchise relationship that existed between [Flooring America] and [Custom Carpet], including, without limitation, the offer, sale, or registration of the [Franchise] Agreement and the CarpetMAX franchise; and (iii) any and all dealings between [Flooring America] and [Custom Carpet] prior to the date of [the Termination] Agreement." On March 24, 2000, Flooring America, operating as the Maxim Group, Inc., issued check number 00059110 payable to Custom Carpet in the amount of $50,000.00 out of the Operating Account. The check was honored by the drawee bank on March 31, 2000.

On June 15, 2000, Flooring America filed a petition for relief under Chapter 11 of the Bankruptcy Code. Morton P. Levine

was appointed as Chapter 11 Trustee of the estates of Flooring America, Inc. and related entities on February 26, 2001. On February 26, 2002, the Trustee demanded return of the $50,000.00 transfer, and on May 31, 2002 the Trustee filed the complaint in this adversary proceeding.

A court will enter summary judgment only upon a showing that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Courts must review all evidence "in the light most favorable to the non-moving party." *Samples on Behalf of Samples v. City of Atlanta,* 846 F.2d 1328, 1330 (11th Cir.1988). In the instant case, the trustee bears the initial burden of establishing that there is no issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). After the trustee meets this initial burden, the burden shifts to the defendant who must go beyond the pleadings and show that an issue of material fact indeed does exist. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant the summary judgment motion. *Samples,* 846 F.2d at 1330.

■ A preference is defined in 11 U.S.C. § 547(b), and the trustee has the burden of proving each element of a transfer. 11 U.S.C. § 547(g). The elements of a preferential transfer are: (1) a transfer of the debtor's property, (2) to or for the benefit of a creditor, (3) for or on account of an antecedent debt owed by the debtor before such transfer was made, (4) made while the debtor was insolvent, (5) within 90 days before bankruptcy, (6) the effect of which transfer was to give the creditor more than he would otherwise have received in a Chapter 7 distribution.

Defendant contends that the Trustee fails to meet his burden as to three of the elements. Defendant argues that there are material facts in dispute regarding whether the transfer was property of the debtor, whether the transfer was made on account of an antecedent debt, and whether the transfer allowed Custom Carpet to receive more than it would have in a Chapter 7 liquidation. Defendant agrees that there was a transfer of $50,000.00 to Custom Carpet within 90 days of bankruptcy at a time when the debtor was insolvent.

### A. Property of the Debtor

The transferred funds came from the debtor's Operating Account. Custom Carpet asserts that the debtor did not have an interest in that portion of the $50,000.00 transfer which represented rebate payments, arguing that the debtor held the rebate payments as an agent for the manufacturer. Debtor argues that the entire $50,000.00 transfer was property of the debtor and shows that the rebate payments were commingled with debtor's other funds and were available for the debtor's general use.

■ The Courts apply a "dominion and control" test to determine if transferred funds constitute "property of the debtor." *Nordberg v. Sanchez (In re Chase & Sanborn Corp.),* 813 F.2d 1177 (11th Cir.1987). In *Chase & Sanborn,* the Eleventh Circuit addressed whether funds placed into a debtor's account by a third-party and subsequently paid to a creditor of the debtor constituted property of the debtor. In concluding that the transfers in question did not constitute property of the debtor, the Eleventh Circuit determined that a court must look beyond the particular transfers in question to the entire circumstances of the transactions. A court must

determine that funds were placed into the debtor's account by a third party with no restrictions on its use and the debtor must actually have the ability to use the funds as it sees fit.

■■■ The debtor here had dominion and control over the rebates and commissions it received from its vendors. There is no evidence that any restrictions were placed on the use of such funds. The vendors were paying a contractual indebtedness owed to the debtor, the funds were placed into the debtor's general funds and only the debtor had authority to direct payment from such account. Such control over assets is a crucial factor in determining whether assets constitute part of a debtor's estate. Debtor's ability to control and direct payment of its funds establishes that the debtor had an interest in such funds and the funds were property of the debtor. Furthermore, courts have consistently held that when transferred assets reduce the total assets available to all of a debtor's creditors, the transferred assets are considered property of the debtor's estate. *See Begier v. Internal Revenue Service,* 496 U.S. 53, 58, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990); *see also In re RDM Sports Group, Inc.,* 253 B.R. 298, 306 (Bankr.N.D.Ga.2000); 5 *Collier on Bankruptcy,* ¶ 547.03[2], p. 547–20. The transfer in the instant case diminished the total assets available to creditors and thus constituted a transfer of the debtor's property.

Contrary to defendant's suggestion that an "agency" relationship existed between the parties, the Franchise Agreement provides that the debtor and the defendant had an "Independent Contractor" relationship and that no agency relationship existed between the parties. The defendant has presented no facts to establish that the funds were held in trust by the debtor for the benefit of the defendant. The debtor, at best, had a contractual obligation to make certain payments to the defendant, but no trust relationship existed.

Finally, even if debtor had been obligated to segregate rebates for Custom Carpet, the undisputed facts show that debtor commingled the rebate payments from vendors with income from all other sources, including its own sales of flooring material, such that none of the alleged "trust funds" could possibly be identified. Funds deposited into a commingled account are generally not treated as trust funds, but are property of the debtor. *Sender v. Heggland Family Trust,* 48 F.3d 470, 474 (10th Cir.1995); *Rosenberg v. Collins,* 624 F.2d 659, 663 (5th Cir.1980); *Ragsdale v. South Fulton Machine Works, Inc. & Whitacre (In re: Whitacre Sunbelt, Inc.),* 211 B.R. 411, 418 (Bankr.N.D.Ga. 1997). The rebates paid to the debtor from suppliers under the Vendor Rebate Programs were commingled with funds from some 281 stores' sales of merchandise, goods and services. Debtor did not segregate, escrow or hold in trust the rebates or commissions received from its suppliers. Considering all the undisputed facts, a reasonable fact finder could not conclude that the funds transferred from the debtor to Custom Carpet within 90 days of bankruptcy were anything other than property of the debtor within the meaning of 11 U.S.C. § 547(b).

## B. The Antecedent Debt Requirement

Plaintiff argues that the $50,000.00 payment to Custom Carpet to settle all claims was a payment on account of an antecedent debt as required by § 547(b)(2). The law supports plaintiff's argument, and many courts have held that payments to settle claims are payments on antecedent debt. In *Southmark Corp. v. Schulte, Roth & Zabel (In re Southmark Corp.),* 88 F.3d 311 (5th Cir.1996), the Court held

that a settlement payment of some $3.3 million was "for or on account of an antecedent debt" within the meaning of the preference statute. The facts in that case involved a proxy contest waged by some minority interest shareholders. In all, five lawsuits had been filed either by Southmark or the minority shareholders, and the parties reached a comprehensive settlement agreement which required Southmark to reimburse the minority interest shareholders' expenses of some $3.3 million. Southmark transferred the funds within ninety days before filing for bankruptcy protection under Chapter 11. Southmark then sued to recover the $3.3 million transfer as a preference.

The lower courts held that the transfer was not recoverable as a preference. The Fifth Circuit reversed and held that the transfer was made for or on account of an antecedent debt. The Court reasoned that a debt is antecedent if it is incurred before the transfer. The issue turned on whether the minority shareholders' demand for expenses in connection with its proxy challenge constituted a "debt" prior to signing the settlement agreement. The Court focused on the Bankruptcy Code definitions of "debt" and "claim" and held that the demand for expenses was a "claim" under the Bankruptcy Code. Even though the right to payment might be disputed and contingent, such a right is encompassed by the broad definition of the term "claim." The Court also concluded that the claim was a "debt". In doing so, the Court turned to the legislative history of the Bankruptcy Code in which the terms "debt" and "claim" are discussed as being "coextensive." Since the minority shareholders had a claim for these expenses prior to signing the settlement agreement, a debt existed for these expenses prior to the signing of the settlement agreement. Thus, the payment was on account of an antecedent debt. Finally, the Court noted that its conclusion was "not only consistent with the statute and the case law, but also comport[ed] with the general observation that a settlement agreement resolves pre-existing claims." *Southmark*, 88 F.3d at 318.

■ The Seventh Circuit used similar reasoning in *Energy Cooperative, Inc. v. SOCAP International (In re Energy Cooperative, Inc.)*, 832 F.2d 997 (7th Cir.1987) to find that a transfer was a preference. In *Energy Cooperative*, a trustee sought to recover a $1.6 million payment as a preference. The debtor had a petroleum refinery, and Socap sold crude oil. The debtor agreed to buy some oil from Socap, but the debtor repudiated the contract. Socap advised the debtor that it would hold it liable for any damages resulting from the breach of contract, and the debtor agreed to pay Socap $1.6 million as compensation for the breach. The bankruptcy was filed within ninety days of the payment. The trustee sued to recover the payment as a voidable preference, and Socap filed a motion for summary judgment, alleging, among other things, that the payment was not for an antecedent debt. The Seventh Circuit determined when the debtor incurred a debt to Socap. Looking at the definitions of "debt" and "claim" and the legislative history, the Court held that Congress gave "debt" the same broad meaning that it gave "claim" and that the terms were "coextensive." "In other words, when a creditor has a claim against a debtor— even if the claim is unliquidated, unfixed, or contingent—the debtor has incurred a debt to the creditor." *Energy Cooperative, Inc.*, 832 F.2d at 1001 (citing *In re Vasu Fabrics, Inc.*, 39 B.R. 513, 516–17 (Bankr.S.D.N.Y.1984)).

The Third Circuit and the Fourth Circuit have both agreed with the reasoning in *Energy Cooperative*. *United States*

Trustee, Securities & Exchange Commission v. First Jersey Securities, Inc. (In re First Jersey Securities, Inc.), 180 F.3d 504, 510 (3rd Cir.1999); Sigmon v. Royal Cake Co., Inc. (In re Cybermech, Inc.), 13 F.3d 818, 822 (4th Cir.1994). Furthermore, the decisions in Southmark and Energy Cooperative are consistent with the law in the Eleventh Circuit. See St. Laurent v. Ambrose (In re St. Laurent), 991 F.2d 672, 678 (11th Cir.1993) (holding that the terms "debt" and "claim" were coextensive in the context of a dischargeability action).

The Supreme Court's recent decision in Archer v. Warner, 538 U.S. 314, 123 S.Ct. 1462, 155 L.Ed.2d 454 (2003) supports the granting of plaintiff's motion for summary judgment. The question presented there was whether the non-dischargeability provisions of § 523(a)(2)(A) could cover a debt embodied in a settlement agreement that resolved an earlier claim for money obtained by fraud. The Supreme Court rejected the Fourth Circuit's view that reducing a fraud claim to a settlement changed the nature of the debt for dischargeability purposes and held that the settlement agreement did not act as a "novation" or create a new debt. The logic used in Archer applies here in the preference context. Defendant Custom Carpet's settlement with the debtor Flooring America did not amount to a novation or a new debt, but was the settlement of a debt previously incurred—an antecedent debt.

Notwithstanding this considerable body of case law, defendant contends that the $50,000.00 payment to settle the claim was not a payment on an antecedent debt. Defendant cites only one case in support of this argument, Lewis v. Diethorn, 893 F.2d 648 (3d Cir.1990). However, the facts in Lewis are distinguishable from the case before the Court, and several courts have recognized the limitations of the Lewis holding.

In Lewis v. Diethorn, the trustee sought to avoid a settlement payment made to resolve some state court litigation and to remove a lis pendens on some of debtor's real estate. The debtor was a real estate developer and the Diethorns had entered into a contract with the developer to build a house. Disputes developed about some defective siding, and the Diethorns sued and placed a lis pendens on the property. The parties settled by the debtor returning the earnest money and paying the Diethorns an additional $15,500.00. In return, the Diethorns agreed to discontinue the state court suit and to take the lis pendens off the property. Within 90 days, the developer filed for Chapter 7 bankruptcy, and the trustee sued the Diethorns to recover the $15,500.00 as a preference.

The Third Circuit reversed the lower courts and held that the payment was not a preference. The holding was based on several grounds. First, the Court found that the payment was not for or on account of an antecedent debt, because the debtor received not just freedom from liability on an antecedent debt, but "the freedom from the risk of litigation, together with the rise in the value of the real estate which resulted when the lis pendens was lifted." Lewis, 893 F.2d at 650 (emphasis added). Second, the Court held that the payment fell within the new value exception in § 547(c)(1) since the payment was intended to be a contemporaneous exchange for new value. Third, the Court held that the Diethorns had an equitable lien on the property, and a payment to satisfy an equitable lien would not be a preference because it would not allow the creditor to receive more than the creditor would receive in a Chapter 7.

The case at bar is easily distinguishable from Lewis. Here, the only thing Flooring America received in exchange for the $50,000.00 payment was freedom from liability on an antecedent debt. Unlike Lew-

*is,* there was no removal of a *lis pendens,* there was no increase in the value of any assets of Flooring America, and there was no satisfaction of an equitable lien as a result of the payment. Other courts have similarly distinguished *Lewis* and held that settlement payments were payments on antecedent debts and avoidable as preferences under § 547 of the Bankruptcy Code. *See Peltz v. New Age Consulting Services, Inc.,* 279 B.R. 99, 104 (Bankr. D.Del.2002); *RDM Holdings, Inc., et al. v. DMAC Investments, Inc. (In re RDM Sports Group, Inc.),* 250 B.R. 805, 813–14 (Bankr.N.D.Ga.2000); *see also Bioplasty, Inc. v. First Trust National Assoc. (In re Bioplasty, Inc.),* 155 B.R. 495, 499 (Bankr. D.Minn.1993) (criticizing and distinguishing *Lewis).*

■ Finally, Custom Carpet argues that the $50,000.00 payment could not have been a payment on an antecedent debt, because Custom Carpet had not yet filed a lawsuit against the debtor. This argument is also without merit. Nothing in the Bankruptcy Code or the case law makes the filing of a lawsuit a prerequisite for finding that a settlement payment is a payment on an antecedent debt. In fact, the Seventh Circuit in *Energy Cooperative* stated that:

> Whether or not a claim and debt exist does not depend on whether a creditor chooses to pursue its claim. Furthermore, under the Bankruptcy Code's broad definition, a contingent claim is still a claim; and, as we have seen, when a claim exists, so does a debt.

*Energy Cooperative, Inc.,* 832 F.2d at 1002.

■ The claim here arose in 1999 when the debtor allegedly breached the exclusive territory provisions of the Franchise Agreement and when the debtor allegedly stopped paying rebates to Custom Carpet. Since a claim and a debt are coextensive, the debts arose in 1999 as well, and the settlement payment made in March of 2000 was for or on account of an antecedent debt.

### C. The Preferential Effect

Plaintiff contends that the undisputed facts show that the transfer allowed the defendant to recover more than it would have in a Chapter 7 liquidation. Defendant offers two arguments in opposition. First, defendant argues that the part of the $50,000.00 transfer that represented rebates had no preferential effect, because the rebate payments were merely a return of Custom Carpet's property, not property of the debtor. The Court has determined that the funds transferred were property of the debtor, not property escrowed or segregated for the defendant, and defendant has presented no facts to suggest that it had a security interest in the debtor's property. Thus, Custom Carpet is properly characterized as an unsecured creditor and its argument to the contrary is not supported by the facts.

■ Defendant also argues that the statement in Greg Dyer's affidavit that "the assets in debtor's estate are insufficient to pay debtor's unsecured creditors a one-hundred percent dividend" is insufficient to meet the Trustee's burden that the transfer had a preferential effect. Custom Carpet has not presented any facts contesting Mr. Dyer's statement that the debtor's assets are insufficient · to pay unsecured creditors one-hundred percent of their claims. As David Epstein, Steve Nickles, and James White state in their treatise, BANKRUPTCY:

> Fortunately, the courts have recognized certain shorthand tests for deciding if a transfer had a preferential effect. The most commonly used test is as follows: In the case of a payment to an unsecured, nonpriority (general) creditor, the preferential effect requirement is satisfied unless general, unsecured creditors

would have received 100% of their claims in the hypothesized Chapter 7 distribution.

1 DAVID G. EPSTEIN, STEVE H. NICKLES, & JAMES J. WHITE, BANKRUPTCY, § 6–20 (1992); *accord Still v. Rossville Bank (In re Chattanooga Wholesale Antiques, Inc.)*, 930 F.2d 458, 465 (6th Cir.1991); *Hays v. DMAC Investments, Inc. (In re RDM Sports Group, Inc., et al.)*, 250 B.R. 805, 815 (Bankr.N.D.Ga.2000); *Clark v. A.B. Hirchfeld Press, Inc. (In re Buyer's Club Markets, Inc.)*, 123 B.R. 895, 897–98 (Bankr.D.Col.1991); *Flatau v. Tribble's Shoes, Inc. (In re Lawrence)*, 82 B.R. 157, 160 (Bankr.M.D.Ga.1988).

 The plaintiff in a preference action need not actually reconstruct a hypothetical Chapter 7 liquidation, with the precision of a forensic accountant, but may rely on an affidavit of one of the debtor's financial officers, the debtor's schedules or prior findings that the estate was administratively insolvent to establish that the distribution to non-priority unsecured creditors would have received less than 100% of their claims in a Chapter 7 liquidation. *See Pioneer Tech., Inc. v. Eastwood (In re Pioneer Tech. Inc.)*, 107 B.R. 698, 701 (9th Cir. BAP 1988) (relying on affidavit of debtor's comptroller that creditor received more than it would have in a hypothetical Chapter 7 to hold that the debtor had met its burden under section 547(b)(5)); *Field v. Lebanon Citizens Nat'l Bank (In re Knee)*, 254 B.R. 710, 713 n. 2 (Bankr. S.D.Ohio 2000) (relying on the trustee's interim report filed earlier in the bankruptcy to hold that the trustee had met her burden under section 547(b)(5)); *RDM Sports Group*, 250 B.R. at 814–16 (holding that the trustee had meet his burden under § 547(b)(5) based on the trustee's affidavit stating that he saw "no reasonable prospect for a 100 percent [sic] distribution to unsecured creditors ...." and on an earlier finding that the debtor was administratively insolvent); *Lawrence*, 82

B.R. at 161 (relying on the debtor's bankruptcy schedules to hold that the trustee had shown that unsecured creditors would receive less than a 100% distribution in a Chapter 7 liquidation).

The affidavit of Greg Dyer is sufficient here to establish that unsecured creditors would have received less than 100% of their claims in a hypothetical Chapter 7 liquidation. The undisputed facts show that Custom Carpet did receive a payment in complete satisfaction of its claim. Therefore, the $50,000.00 transfer allowed Custom Carpet to receive more than it would have in a hypothetical Chapter 7 liquidation.

In accordance with the above reasoning, plaintiff is entitled to a summary judgment on his preference claim, and the Court need not reach plaintiff's alternative request for a summary judgment on the fraudulent conveyance claim. A judgment will be issued in accordance with this decision.